[Civ. No. 3915.   Fourth Dist.   June 24, 1949.]

SALLY J. MURPHY, Respondent, v. TRAVELERS INSUR-
ANCE COMPANY (a Corporation), Defendant; MARY
V. MURPHY, Appellant.

Whelan & Whelan for Appellant.

Martin & Mahedy and V. P. Lucas for Respondent.

GRIFFIN, J.—Plaintiff, Sally J. Murphy, wife of the insured John E. Murphy, was adjudged to be entitled to one-half of the proceeds of a life insurance policy issued by defendant company in which the assured's mother, Mary V. Murphy, appellant herein, was named beneficiary.

The defendant company deposited into court $10,000, double the face value of the policy, because Mr. Murphy's death was due to accidental means on December 10, 1946, in the State of Virginia.

The plaintiff claimed and the court found that all premiums were paid from community funds of the plaintiff and Mr. Murphy. The contention presented on this appeal is that the

judgment and findings are not supported by the evidence for two reasons: (1) That seven monthly payments were paid prior to plaintiff's marriage to the assured from the separate funds of the assured; and (2) That the evidence does not establish that any of the other payments were made from community funds nor that the insured was a resident of California from the year 1926 until his death. It is contended that during the period in question the assured's domicile was in Pennsylvania, in which state the community property law did not apply, and therefore the distribution of one-half of the proceeds of the policy to the wife was erroneous and that the findings in this connection do not support the judgment.

The facts show that the assured, Mr. Murphy, during his boyhood life, lived with his mother in Pennsylvania. He secured an appointment to the United States Military Academy at Annapolis in 1918, graduated in 1922, and was first assigned to duty in New England, thence to San Pedro, California in 1925 or 1926, and was an officer on the U. S. S. Oklahoma. While at San Pedro he met plaintiff. She was then living in an apartment in that city. She had been keeping company with Murphy about a year before their marriage, and according to her testimony she and her husband discussed where they would have their permanent home and had "that decided before we were even married"; that during that year they went to Point Fermin, near San Pedro, and they decided some day they would have their home in that very spot; that they discussed building it then and renting it and "have it pay for itself," and they would have it when he finally retired or was sooner discharged from the Navy; that they, at that time, also discussed buying property in San Diego County; that in 1935 they looked at a house there but that the sale was not consummated; that again in 1944 they decided to build in Coronado and that in 1945 they bought a lot for that purpose and endeavored to secure a loan from a bank in Coronado; (the banker corroborated this testimony); that they also contemplated the purchase of a farm in Wildomar, California, because he soon would be able to retire on three-fourths pay. Pictures and plans of the house in Wildomar, California, and books on raising turkeys and bees were found in Mr. Murphy's personal effects at the time of his accidental death.

Plaintiff exhibited plans of a house and garage apartment drawn in 1945 which were selected by Mr. Murphy for the Coronado lot. Murphy had registered to vote in California

in 1935, 1936, 1937 and 1938, and in 1940 his registration was canceled, due to the fact that he failed to vote that year. He had never registered to vote in any other state during their married life. In 1937, he claimed a veteran's exemption from taxes in San Diego County on an affidavit that he had been a resident of that county since 1936.

While in San Diego, on September 29, 1936, he executed a will in which he declared himself a resident of San Diego County, California. The evidence shows that, as to plaintiff, she was and had been a resident of California up to the time of her marriage on November 28, 1926, and at all times looked upon California as her place of domicile and the place to which she intended to return even though she followed her husband about in the course of his military service. She maintained her apartment in San Pedro from six to nine months after her marriage. Her husband was ordered to Florida for duty for six or eight months. He told her to remain in California. He then wired her to meet him in Pittsburgh, Pennsylvania, because he had been ordered to Panama. They visited with Murphy's mother in Wilkinsberg, Pennsylvania, for about one week. Thereafter they went to New York for three or four months. Murphy then went to Panama and plaintiff followed him. They stayed there for about nine months and thence went to Boston, Massachusetts, for two or three months. He was ordered to the Naval Academy for postgraduate work and plaintiff followed him there, where they lived for one and a half years. He then traveled all over the east coast and then went to Columbia University in New York for one full term. They lived there. Their daughter Patricia was born there. Murphy put in for duty in California but was ordered to China. Plaintiff and the child went with him and stayed about three and a half years. In 1933, they returned to California. Plaintiff lived there for about three months. Her husband went on to Washington, D. C. where she later joined him. In 1935, both come to California and lived in San Diego. Mr. Murphy was in command of a destroyer operating out of that city. It was at that time he registered to vote and claimed a veteran's property tax exemption as a resident of California. In 1938, he was assigned to duty in New York. He and his wife then lived in Drexel Hill, Pennsylvania, and both returned to California in 1944, where plaintiff continually resided thereafter. Mr. Murphy was commanding officer at the training base at Coronado for about one and a half years. In 1945, he left for further sea duty,

and died in an automobile accident while returning to his ship from a conference in Washington, D. C.

Many witnesses were called who knew Mr. Murphy before and after his marriage to plaintiff. They corroborated plaintiff's testimony that prior to and after they were married they intended making California their home and that it was the place where they intended to return and settle down whenever conditions were such as to allow them some permanency of residence. According to the testimony of their daughter, now 18, in 1945, her father used to drive her by the lot he purchased in Coronado and tell her about his plans and how he was going to build on that lot; that even as late as May 20, 1946, he gave her a check for $2,000 as a down payment to be made on the house to be built; and that her father was working on a model of his contemplated home and that he died before he finished it.

On the other hand, there was evidence produced that Mr. Murphy filed an action for divorce against plaintiff on June 25, 1946, in Alleghany County, Pennsylvania, in which he claimed he had been a resident of Pennsylvania for more than a year (Plaintiff accounts for this action as "just a lovers' quarrel"); that he did, in 1946, execute another will in Norfolk, Virginia, in which he named, according to plaintiff's version, "another woman" as one of his beneficiaries. Mr. Murphy maintained his mother's address in Pennsylvania in connection with his service record.

Upon this evidence Mary V. Murphy, the mother, contends that the plaintiff has not carried the burden of showing that Mr. Murphy ever intended to establish his residence in California or did any act in furtherance of such intent but maintained his residence in Pennsylvania all the time, or, if not, his domicile could only be claimed to have been in California since 1935, when he registered to vote in that state, and therefore, accordingly, the order distributing one-half of the proceeds to plaintiff, as community property, was erroneous, citing such cases as *Estate of Warner,* 167 Cal. 686 [140 P. 583], *Estate of Frees,* 187 Cal. 150 [201 P. 112]; *Johnston* v. *Benton,* 73 Cal.App. 565 [239 P. 60]; *Wise* v. *Bolster,* (1939) 31 F.Supp. 856; *Ex parte White,* 228 F. 88; *Briggs* v. *Superior Court,* 81 Cal.App.2d 240 [183 P.2d 758]; *Casner* v. *San Diego Trust & Savings Bank,* 34 Cal.App.2d 524 [94 P.2d 65]; and *Percy* v. *Percy,* 188 Cal. 765 [207 P. 369].

■ Under the authorities cited it is well settled that the domicile of a person is not necessarily affected by his enlist-

ment in the civil, military or naval service of his country, nor does he necessarily acquire one at the place where he serves. On the other hand, the fact of being on military duty does not preclude him, if he so desires, from establishing a residence in the state where he is stationed. ■ The question whether a person has changed his residence from one place to another must depend largely upon his intention. (*Johnston* v. *Benton, supra.*) ■ A domicile once acquired is presumed to continue until it is shown to have been changed, and to constitute the new domicile two things are indispensable: First, residence in the new locality; and second, the intention to remain there. (*Mitchell* v. *United States*, 21 Wall. (U.S.) 350 [22 L.Ed. 584, 588]; Whart. Conflict of Laws, § 55, and authorities cited; *Sheehan* v. *Scott*, 145 Cal. 684, 690 [79 P. 350].) ■ The term "domicile" has been defined as the place whence a person goes for labor or other temporary purpose and whither he returns in seasons of repose. It is the place where a person has his home, or his principal home, or where he has his family residence and principal place of business; that residence from which there is no present intention to remove, or to which there is a general intention to return. (9 Cal.Jur. § 2, p. 832.) (See, also, Gov. Code, §§ 243 and 244.) ■ Murphy's domicile of origin was with his parents in Pennsylvania. From the time he left the academy he never lived there, although he vacationed there, and he and his wife visited there on occasions subsequent to their marriage. There is no evidence that he considered this place as the domicile for his wife, himself and child at any time after the marriage. They never lived there. They were entitled to claim some place or state as their domicile. Their status in the other places to which he was transferred did not indicate the establishment of a domicile. Murphy's wife was born in and domiciled in California at the time of her marriage to him and apparently maintained an apartment there for six or eight months after their marriage. They discussed their intention of making California their home even before their marriage and looked at property they thought they would like to select. This was some overt act indicating their intention at that time. He discussed with his fellow officers, other associates and his insurance agent who sold him the policy, his intention of making California his home, even before marriage. He applied for assignment to California for service and dis-

cussed building a home in California in case of such assign-
ment. Subsequently, he registered to vote in California and
claimed certain tax exemptions as a resident of that state.
He examined ranch property there with the idea of retiring
to it and raising turkeys and bees and at the time of his death
he still possessed the plans and literature on the subject, all
of which was strong evidence that he originally selected Cali-
fornia as his domicile at the time of his marriage and that at
all times since he intended it as such, and that during his
service that was the state to which he intended to return and
maintain his permanent domicile.

■ True, there was evidence opposed to this conclusion.
The trial judge was the one to decide this conflict and his
determination cannot be disturbed on appeal. (*Percy* v. *Percy,
supra*; *Johnston* v. *Benton, supra*; *Berger* v. *Superior Court,*
79 Cal.App.2d 425 [179 P.2d 600]; *De Pier* v. *Maddox,* 87
Cal.App.2d 460 [197 P.2d 87]; *Estate of Winzeler,* 42 Cal.
App.2d 246 [108 P.2d 720]; *District of Columbia* v. *Murphy,*
314 U.S. 441 [62 S.Ct. 303, 86 L.Ed. 329, 337].)

■ A more serious question arises as to appellant's con-
tention that seven months' premiums were paid by Mr.
Murphy on the policy in question prior to his marriage to
plaintiff and that therefore the court's finding that all pre-
miums accrued were paid from community funds after their
marriage and that the entire proceeds therefrom were com-
munity property, and the judgment based thereon lack evi-
dentiary support. The evidence on this question is undisputed
and shows that the policy was delivered on or about May
25, 1926, and although, upon its face, the policy was stated
to be based on an annual premium, there were arrangements
made through the Navy Department and the insurance com-
pany, to deduct, in advance, $11.01 per month from Murphy's
service pay, in payment of the annual premium from the
date of the policy.

The finding that this proportionate share of the proceeds
of the policy was community property was erroneous and not
supported by the evidence. (*Modern Woodmen of America*
v. *Gray,* 113 Cal.App. 729 [299 P. 754].)

The findings and judgment should be and are modified
accordingly. Since this determination is but a mathematical
calculation, that portion of the judgment awarding plaintiff
the sum of $5,000 is modified by reducing it to $4,857.72. That
portion of the judgment awarding defendant Mary V. Murphy

$5,000 is modified by increasing it to $5,142.28. As thus modified the judgment is affirmed. Respondent to recover costs on appeal.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied July 21, 1949, and respondent's petition for a hearing by the Supreme Court was denied August 18, 1949.