[No. A052035. First Dist., Div. Four. Mar. 25, 1992.]

DANNY T. DeMIGLIO et al., Plaintiffs and Respondents, v.
LLOYD MASHORE, Defendant and Appellant.

## COUNSEL

McCabe, Schwartz, Evans, Levy & Dawe, Marchmont J. Schwartz and Bryce C. Anderson for Defendant and Appellant.

Carl Lindstrom and Jennifer E. Ereno for Plaintiffs and Respondents.

## OPINION

**ANDERSON, P. J.**—This is the second appeal in the election contest brought by Concord electors Danny T. DeMiglio and Mary Bacon (hereafter contestants) upon allegations that appellant Lloyd Mashore was not domiciled in Concord at the relevant times and, thus, was ineligible for the office of councilperson.

The Concord electors elected Mashore to their city council on November 7, 1989. Contestants filed a timely election challenge and succeeded in obtaining a judgment annulling his election. The sole issue at trial was

whether Mashore had the requisite intent, as defined by statute, to establish his domicile in Concord.[1] We concluded the trial court made reversible legal errors and issued contradictory findings and, accordingly, reversed and remanded. The trial court prepared additional findings which, read in conjunction with the original findings and judgment, again resulted in a judgment of annulment. This appeal followed wherein Mashore again challenges the validity of the findings and also raises a jurisdictional issue. We find reversible error and conclude the evidence does not support the judgment. We direct the entry of judgment upholding the election of Mashore to the Concord City Council.

## I. THE FIRST APPEAL

### A. *Facts*

Mashore has been senior pastor and chief executive officer of the Concord Christian Church since 1973. He and his wife purchased a home at 1509 Tara Court in Clayton in 1985, and lived there until May 1, 1989, paying off the mortgage in 1987. Sometime in 1987 the Mashores asked real estate agent David Sawyer, also vice-chairperson of Mashore's campaign committee, to find them a house in Concord similar to the Tara Court residence.

In 1989 Mashore began thinking about running for city council in Concord. In April 1989 he had a family conversation with Gregory and Laurie, his adult son and daughter, about his intention of moving back to Concord to establish residency there in order to run for city council. He offered them the opportunity of moving to the Tara Court home; in turn they would give up their Concord apartment at 4265 Clayton Road. The idea was that Mashore and his wife would move into the apartment and Gregory and Laurie could stay at Tara Court as long as they wanted. The children had been paying about $600 per month rent on the apartment and would pay that amount to their parents as rent for Tara Court.

The Mashores executed a month-to-month rental agreement for the apartment at 4265 Clayton Road, Concord, and moved there on May 1, 1989, taking bedroom furniture, some household goods, clothing and other personal items from Tara Court. Mashore changed his voting registration to

---

[1]There are two requirements for holding the office of councilperson: the person must be (1) an elector of the city when he or she assumes office, and (2) a registered voter of the city when nomination papers were issued. (Gov. Code, § 36502.) Contestants do not dispute the latter; the dispute here depends on whether Mashore was an "elector" of Concord. An "elector" is a United States citizen, 18 years of age or older, who is a resident of an election precinct at least 29 days before an election. (Elec. Code, § 17.) For our purposes the term "residence" is synonymous with "domicile." (Elec. Code, § 200, subd. (a).)

reflect his new address. He also put the "PG&E" account in his name, had cable installed in his name, but left the telephone in his son's name. He continued to maintain all utilities at the Tara Court property. Mashore testified his intention in moving was to make the apartment "our permanent place of residence until we selected another place." He said they wanted to purchase a home in Concord by borrowing against the Clayton property.

Another, more suitable apartment became available and the Mashores moved mid-July to 1599 Denkinger Court, Concord. Concurrently, the Clayton Road apartment became Mashore's campaign headquarters. Their son, Bradley, began living at the headquarters at that time. He explained to the manager that someone had to be there to watch the equipment. Again, Mashore signed a month-to-month rental agreement, opened a "PG&E" account in his name and notified the elections department of this move.

The resident manager of both complexes in Concord where the Mashores rented apartments testified that the couple received visitors there, she observed their blue Buick in the parking lot and she saw Mrs. Mashore doing laundry three to four times a week.

Ronald Schwartz, who lived next door to the Mashores' Tara Court property, testified that during the months of May through August 1989, he saw Mashore at the house from time to time and observed his blue vehicle there, characterizing the frequency as "on a regular basis," "a significant amount of time" and "from time to time." Mashore stated that he and his wife customarily had Sunday dinner at Tara Court with their children.

On November 22 Mashore, through his secretary, inquired of the assessor's office if they should remove the homeowner's real property tax exemption on their Tara Court property. The clerk told the secretary the Mashores could not make the change at that time, but the office would make a note and process the change in a timely fashion. On December 20 the Mashores followed up by providing the assessor's office with written notice of termination.

That month they also finally found their home at 5411 Paso Del Rio Court (the home they were looking for in Concord) and mortgaged the Tara Court property to purchase it.

### B. *Our First Opinion*

The trial court ultimately found, "from all the evidence," that Mashore never relinquished his Clayton domicile. The court also made a number of

subsidiary findings germane to the issue of intent, some of which support the contrary conclusion that he did relinquish his Clayton domicile. The principal findings and inferences supporting the court's conclusion that Mashore never relinquished his Clayton domicile concerned his homeowners' property tax exemption for the Clayton residence, which the court discussed with reference to the statutory presumption set forth in Elections Code,[2] section 211.

We concluded the court misapplied the key statutes in that it drew a number of negative and incorrect inferences from its understanding of how the exemption operates. We also determined that the court made contradictory findings on the issue of intent, and reversed and remanded with explicit directions.

## II. REMAND: TRIAL COURT JURISDICTION

■ We filed our first decision on November 16, 1990. The remittitur issued from this court on January 16, 1991, and was filed in the superior court on January 18. However, the trial court, per our remand instructions, had already issued its "Additional Findings on Remand" on December 21, 1990.

There is no doubt that the trial court issued its additional findings prematurely. We will not, however, fault such promptness: the appellate record has already been filed, the case is fully briefed and we see no reason to dismiss this appeal only to have the "Additional Findings on Remand" properly dated and titled. Therefore, in the interests of justice and to avoid unnecessary delay, we construe the "Additional Findings on Remand" as having been filed on January 18, 1991, and as incorporating the original "Findings and Judgment" to the extent consistent with the additional findings on remand.

## III. BURDEN OF PROOF AND SUFFICIENCY OF THE EVIDENCE

We remanded the cause to the trial court with the following directions: "[T]o redetermine the issue of intent by reweighing the evidence and reconsidering the record without reference to the section 211 presumption. Since the record is ample and complete, and in light of the compelling interest of the electorate in knowing for certain whether its elected official is indeed official, we see no need for taking additional evidence. [¶] On remand the court should reconcile the contradictory findings of intent to establish a qualifying Concord residence and no intent to relinquish the Clayton domicile, and should make new or additional findings as appropriate. In this latter

---

[2]All statutory references are to the Elections Code unless otherwise indicated.

regard we note Mashore introduced uncontradicted and unimpeached testimony that when he and his wife moved in May, they were in the process of looking for a home to purchase in Concord, intended to purchase a home there, and continued to search until December when they found a suitable place. The court made no reference to the house search, yet it bears directly on intent; a finding on this matter might well assist in resolving the intent issue."

## A. *Trial Court Findings on Remand*

On remand the trial court indicated that in accordance with our directions it redetermined the issue of intent by weighing the evidence and reconsidering the record, without considering the presumption set forth in section 211. Again, it made the ultimate finding that Mashore did not establish a domicile in Concord prior to his election.

The court made several new and specific subsidiary findings concerning the issue of intent. First, regarding Mashore's efforts to locate a home in Concord to purchase, the court found that Mashore's original search efforts in 1987 or 1988, during which time he saw three or four residences, did not coincide with his decision to seek public office, which did not occur until April of 1989.[3] It concluded that whatever intention Mashore had to establish a domicile in Concord during the 1987 or 1988 search terminated when that search was discontinued in 1987 or 1988, and he did not form an intention to establish a domicile in Concord until after the election.

In this regard Mashore testified that after he moved to Concord, he and his wife continued looking for a home, and that he observed one home for sale while walking precincts, which his wife then viewed. The court found that Mashore's testimony about a search *after* his move to Concord lacked credibility and noted there was no evidence from which an inference could be made that Mashore intended to relinquish his Clayton domicile for a new domicile in Concord.

The court also viewed the exchange of residences with two of his children as intended by Mashore to provide a temporary residence in Concord, upon

---

[3]Mashore testified that he engaged the services of David Sawyer in 1987 to find a home in Concord similar to the one he and his wife owned in Clayton. He intended to pay for the Concord home by borrowing against the Clayton property for the downpayment and securing a loan for the remainder. Sawyer was vice-president of his campaign committee. Mashore stated that from 1987 until May 1, 1989, he probably saw three or four homes, and his wife saw four to five times that many, but they did not find anything to their liking.

The court construed the original house search as occurring in 1987 or 1988; in fact, the questioning divided the house search effort into pre- and post-May 1, 1989, efforts. From the record it appears Mashore made the decision to run for office in early 1989, probably in April.

his belief that physical presence was sufficient to qualify him as an elector. In this regard Mashore testified he moved to Concord so he could run for office. In its findings the court further commented that Mashore offered no testimony that the move related to change of his *domicile*.

Further, the court on remand found that prior to the electoral challenge in November 1989, Mashore was not aware that his domicile was material to qualifying as an elector. At that time he became aware that residency in Concord alone would not qualify him. The court noted that the sole issue in the November challenge was his intent with respect to domicile, that the challenge caused him to be apprehensive and that the following day he directed a staff member to inquire about his Clayton homeowner's exemption.

Finally, the court also pointed out that Mashore's responses on direct and cross-examination to questions about his intention in making the Concord apartments his residence[4] were inconsistent, evasive and lacked credibility, concluding: "There is no direct and unequivocal testimony from which an inference can be drawn that defendant intended to relinquish his Clayton domicile for a new domicile at the apartments in Concord. Defendant's testimony on the subject was evasive and the only inference that can be drawn therefrom is that he never intended to change his domicile."

## B. *Discussion*

Mashore deduces from the court's decision that it erroneously and prejudicially placed the burden on him to prove that he had been domiciled in Concord prior to the election, rather than requiring contestants to prove he was not. In other words, because Mashore did not offer evidence in support of specific point, or because his testimony was not believed, there was no proof of intent to establish his domicile in Concord and, therefore, he loses. Mashore contends that the court's key findings were all negative in that the court drew all relevant conclusions from its rejection of evidence supporting Mashore, rather than from evidence supporting contestants.

---

[4]The court specifically referred to the following exchanges:

Direct examination: "Q. . . . When you moved into the Clayton Road apartment in May, . . . what was your intention insofar as making the apartment yours and your wife's residence? [¶] A. Our intention was that that would be our permanent place of residence until we selected another place. [¶] Q. . . . in July when you moved to the Denkinger property, what intent did you have at that time regarding the Denkinger property as your residence? [¶] A. Of making that our permanent residence until we could find an acceptable home to purchase."

Cross-examination: "Q. . . . what you're saying is that you were going to temporarily stay at these residents in Denkinger Court and on Clayton Road until you got the house you wanted to buy; is that correct? [¶] A. Yes."

We determine that the trial court correctly placed the burden on Mashore to prove a change of domicile, but that it made reversible legal errors in evaluating Mashore's testimony on that topic. We further resolve that the evidence is not sufficient to support the court's ultimate finding that Mashore did not relinquish his Clayton domicile.

■ We of course agree that the contestant must prove the defect in the election process by clear and convincing evidence. (*Wilks* v. *Mouton* (1986) 42 Cal.3d 400, 404 [229 Cal.Rptr. 1, 722 P.2d 187].) We also agree that a rejection of testimony does not create affirmative evidence to the contrary. (*Estate of Kuttler* (1958) 160 Cal.App.2d 332, 337 [325 P.2d 624].) Nevertheless, when an election challenge centers on whether the candidate had effected a change of domicile, a review of the law of domicile presents an interesting twist on what constitutes the contestant's case in chief as contrasted with the candidate's defense.

■ The law presumes that a domicile, once acquired, continues until it is shown that a new domicile is acquired. (*Murphy* v. *Travelers Ins. Co.* (1949) 92 Cal.App.2d 582, 587 [207 P.2d 595]; *Griffin* v. *Griffin* (1953) 122 Cal.App.2d 92, 98 [264 P.2d 167].) At any given time, there can only be one domicile. (Gov. Code, § 244, subd. (b).) Once established, a domicile cannot be lost until another is gained. (*Id.*, at subd. (c).) Moreover, in order to change domiciles, there must be a union of act and intent. (*Id.*, at subd. (f); § 205.[5]) Thus our courts have held that two elements are indispensable to accomplishing a change of domicile: actual residence in the new locality plus the intent to remain there. (*Sheehan* v. *Scott* (1905) 145 Cal. 684, 690-691 [79 P. 350], overruled on other grounds in *Zeilenga* v. *Nelson* (1971) 4 Cal.3d 716, 722 [94 Cal.Rptr. 602] [overruled on other grounds in *Johnson* v. *Hamilton* (1975) 15 Cal.3d 461 [125 Cal.Rptr. 129, 541 P.2d 881] as stated in *Rittenband* v. *Cory* (1984) 159 Cal.App.3d 410 [205 Cal.Rptr. 576]]; *Murphy* v. *Travelers Ins. Co., supra,* 92 Cal.App.2d at p. 587.) Moreover, the code specifically addresses the issue of temporary moves: when a person leaves his or her home to go into another precinct for temporary purposes only, the question whether he or she loses the "old" domicile or gains a "new" one likewise depends on whether there is an intent to return or an intent to make a new home. (§ 202.[6])

■ Where, as here, contestants assert that domicile exists in a nonqualifying jurisdiction and the candidate asserts a change of domicile, the

---

[5]This statute reads: "The mere intention to acquire a new domicile, without the fact of removal avails nothing, neither does the fact of removal without the intention."

[6]This provision reads in its entirety: "(a) A person who leaves his or her home to go into another state or precinct in this state for temporary purposes merely, with the intention of returning, does not lose his or her domicile. [¶] (b) A person does not gain a domicile in any precinct into which he or she comes for temporary purposes merely, without the intention of making that precinct his or her home."

contestant's burden is to establish existence of the candidate's nonqualifying domicile while the candidate's burden, by way of defense, is to prove the acquisition of a new domicile in the appropriate electoral jurisdiction. (*Sheehan* v. *Scott, supra*, 145 Cal. at pp. 688-689.)

In *Sheehan*, an elector of San Francisco asserted that the city's alleged tax collector was ineligible for that office because at the relevant times he was an elector of Santa Clara County and domiciled there. The trial court found he was not an elector at the pertinent times. On review our Supreme Court held: "Whether he had this qualification was an ultimate fact depending upon certain probative facts, and the determination of the superior court upon these probative facts, so far as such determination was made upon conflicting evidence, or by reason of inferences from established facts, must be accepted as correct. *After it had been shown that he had acquired a domicile in the county of Santa Clara, the burden of proof was upon him* [*i.e., the candidate*] *to show that he had acquired another domicile in San Francisco.*" (*Sheehan* v. *Scott, supra*, 145 Cal. at pp. 688-689, italics added.) Thus, the person asserting the change of domicile has the burden of proving acquisition of a new domicile.

In this case there is no question but that Mashore physically moved to Concord in May 1989. The issue is whether he had the intent to remain in Concord. Under *Sheehan*, it was his burden to prove this intent once contestants proved he had earlier established a domicile in Clayton.[7]

 On this point the trial court found Mashore's responses were inconsistent, evasive and lacking in credibility. These responses, set forth in footnote 4, are not at all inconsistent or evasive. The trial court presumably saw inconsistency, evasion and lack of credibility in the fact that Mashore, when choosing his own language, spoke of establishing a "permanent" residence until they found an acceptable home, but responded in the affirmative when answering counsel's query on cross-examination as to whether he meant he would "temporarily stay" at the apartments until finding a home to buy. We pointed out in our first opinion that the concept of a temporary versus permanent move has to do with the territorial jurisdiction, not the actual dwelling place: "[T]he notions of permanency and an intention to remain which attach to the domicile concept have nothing to do with the actual dwelling, and everything to do with the actual place or location. A

---

[7]This they did by introducing evidence that the Mashores moved from Concord to Clayton in 1985, sold their Concord home, and purchased their home at 1509 Tara Court, Clayton. They lived there continually until May 1989 when they physically moved to Concord. They continued to maintain ownership of and pay all utilities on their Clayton home while living in Concord.

person could be domiciled in one town all his or her life and have many residences, some obviously temporary. That is what happened here. The Mashores moved *within* Concord until they found a house to their liking which was not until after the election."

The trial court could not properly reject Mashore's testimony for an inconsistency and evasion that does not appear in the record and which is based on a misunderstanding of the law. This was reversible error. We further conclude there was no substantial evidence to support a finding that Mashore lacked the intent to change domiciles. Therefore, we reverse with directions to enter judgment affirming the election.

■ Subject to an exception not pertinent here, "the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact." (Evid. Code, § 411.) Under this rule the trier of fact may not arbitrarily disregard the uncontradicted or unimpeached testimony of a witness, unless that testimony is inherently improbable. (*Hayward* v. *Rogers* (1882) 62 Cal. 348, 372 [62 Cal. 348]; *Sweeney* v. *Insurance Co.* (1937) 30 Cal.App.2d Supp. 767, 771-772 [92 P.2d 1043]; *Krause* v. *Apodaca* (1960) 186 Cal.App.2d 413, 417 [9 Cal.Rptr. 10] [expert testimony]; 3 Witkin, Cal. Evidence (3d ed. 1986) § 1750, pp. 1704-1705.)

■ In this case Mashore testified to the requisite intent but the court rejected his statements for impermissible reasons. Obviously his testimony is not inherently improbable. The question becomes whether it was otherwise impeached or contradicted. We determine it was not and, therefore, the ultimate finding that Mashore did not intend to change domiciles lacked evidentiary support.

First, we point out that the trial court also alluded to the exchange of residences with the Mashore children as showing that he intended only to "provide a temporary residence," the trial court inferred from Mashore's testimony that he believed his physical presence was sufficient to qualify as an elector. But again, this underscores the trial court's confusion concerning the difference between a dwelling and a temporary stay in another jurisdiction. If the trial court meant to fault the witness for his use of the word "residence," this is without merit. "Domicile" is a legal, technical concept, and the code itself uses the term "domicile" and "residence" interchangeably. (§ 200, subd. (a).)

Second, the trial court rejected Mashore's testimony concerning his search for a home after moving to Concord as lacking credibility because he did not offer particulars as to the nature and extent of his wife's search efforts, and

did not call his wife or a realtor to testify on his behalf. In fact his testimony on this subject was by way of answering questions asked under Evidence Code section 776; it was not "offered" as part of his defense. (See Evid. Code, § 412: "If weaker and less satisfactory evidence is *offered* when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust." [Italics added].)

Finally, we conclude the other evidence offered does not, by way of inference, contradict Mashore's direct evidence on the issue of intent. Supporting Mashore's direct testimony are additional facts which the trial court initially found, namely, that the couple permitted their children to live at Tara Court for an indefinite period of time, the Mashores never spent another night in Clayton and Mashore duly registered to vote in Concord. The simple facts of the house swap, the leaving behind of some household furnishings, the maintaining of all the Tara Court utilities and showing up at Tara Court from time to time do not reasonably support the inference that Mashore did not intend to relinquish his Clayton domicile. All of this evidence is consistent with maintaining relations with family members and maintaining two residences, which the election laws do not forbid.

We reverse the judgment and direct that judgment be entered upholding Mashore's election to the Concord City Council. Contestants to bear costs on appeal.

Poché, J., and Reardon, J., concurred.

A petition for a rehearing was denied April 16, 1992.